J-A15014-22
J-A15015-22

2022 PA Super 157

| IN THE INTEREST OF: M.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.E.E., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 113 WDA 2022 |

Appeal from the Order Entered January 18, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-77-2021

| IN THE INTEREST OF: M.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.E.E. FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 114 WDA 2022 |

Appeal from the Order Entered January 18, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-78-2021

| IN THE INTEREST OF: M.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 133 WDA 2022 |

Appeal from the Order Entered January 18, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000077-2021

J-A15014-22
J-A15015-22

IN THE INTEREST OF: M.E., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: K.E., MOTHER :
:
:
:
:
: No. 134 WDA 2022

Appeal from the Order Entered January 18, 2022
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000078-2021

BEFORE: BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

OPINION BY BOWES, J.: **FILED: September 14, 2022**

J.E. ("Father") and K.E. ("Mother") appeal from the orders entered on January 18, 2022, which involuntarily terminated their parental rights to M.M.E. and M.R.E., their minor daughters born in July 2016 and August 2019, respectively.[1] After review, we affirm.

This case, and the involvement of Allegheny County Children, Youth and Families ("CYF") with this family, stems from severe injuries inflicted upon M.R.E. when she was approximately one month old. M.R.E.'s pediatrician was the first person to discover the injuries. The orphans' court recounted the facts in the certified record regarding the pediatrician's discovery as follows:

> [Around 2:30 p.m.] on Wednesday, September 11, 2019, [M]other called the pediatrician's office to obtain an appointment for [M.R.E.] later that same day. Mother indicated she requested

_____

[1] We consolidated the appeals for ease of disposition because they involve identical facts and stem from parallel orders, which the orphans' court reinforced in a single opinion filed pursuant to Pa.R.A.P. 1925(a).

- 2 -

the appointment because [M.R.E.] was not consuming a lot of food, and when she did eat, [M.R.E.] would vomit.

When [F]ather returned home from work that day, the parents and both children went to the pediatrician's office for the appointment. The pediatrician, Dr. Brittany Raburn, had a note on the schedule that [M.R.E.'s] appointment was because [M.R.E.] was "not eating well, no fever, refusing to eat at times, wet diaper one hour ago." Upon arrival in the examination room, Dr. Raburn's staff conducted a pulse ox reading on the baby, which came back at 94 percent. Dr. Raburn entered the examination room and observed that the baby was in clear distress, with a pulse ox reading of 84 percent. Dr. Raburn told [Father and Mother] she was going to call an ambulance and estimated she made this decision within a minute of being in the room and observing the child. While the nurses in the pediatrician's office called for the ambulance, Dr. Raburn had oxygen brought to [M.R.E.] Other than the crying and distress, Dr. Raburn noticed that there was bruising on [M.R.E.'s] face that was "quite significant," specifically, "bluish bruising on both cheeks" and "other scattered bruising on her body as well." Dr. Raburn attempted to get an explanation from [Father and Mother] but the main concern they identified was that "she wasn't feeding appropriate, that she wasn't taking her bottles as she normally did in the last two days. That was their biggest complaint." Upon her further questioning, [Father and Mother] acknowledged that they noticed the infant had some difficulty breathing earlier that day.

Orphans' Court Opinion, 3/3/22, at 2-4 (citations omitted).

Following her transport by ambulance to Children's Hospital of Pittsburgh, M.R.E. was admitted to the pediatric intensive care unit ("PICU") in critical condition. Dr. Jennifer Clarke, who is employed by Children's Hospital of Pittsburgh in the Child Advocacy Center ("CAC") department, examined M.R.E. as part of a consult on M.R.E.'s medical situation. The orphans' court provided the following summary of Dr. Clarke's assessment of M.R.E.'s injuries:

- 3 -

M.R.E. had nineteen total rib fractures, and as a result of that trauma, there was fluid and blood in her chest that required a chest tube for drainage, and she required continued oxygen support through a nasal cannula. These rib fractures, Dr. Clarke stated, is most commonly caused in infants by "squeezing."

The CT scan showed "parietal skull fractures, as well as blood in her brain, subdural and subarachnoid hemorrhages," which was confirmed by MRI. Dr. Clarke explained that these injuries would have resulted from a violent shaking of the child and an impact to the back of the child's head.

MRI of [M.R.E.'s] cervical spine showed edema in her soft tissue indicative of a neck sprain. In addition to the fluid in her chest, the chest CT also showed "extensive soft tissue swelling of her back," which was concerning for additional impact trauma, such as a "slam down on her back."

The abdominal CT depicted a linear, one to two centimeter laceration of her liver. Dr. Clarke stated this would have been due to a blunt force trauma and could have been a result of "a stomp on her, that would be compressive forces, and potentially explain some of her injuries."

The skeletal survey which, in addition to the nineteen rib fractures, showed a transverse radius fracture in her left arm, and multiple corner fractures in her legs. Dr. Clark stated that the forearm fracture is normally seen with direct impact trauma "or a very strong yank or grab to that forearm." Dr. Clarke also explained that the corner fractures in her legs, located around her knees and her ankles, usually occur with yanking or jerking of the extremity, which could also happen if extremities were flailing during a violent shake.

Finally, Dr. Clarke found that there was a nearly healed upper frenulum injury. Dr. Clarke stated that the frenulum injury occurs in toddlers who run and fall but that a four[-]week[-]old infant could not cause this injury. Dr. Clarke stated that the infant could not have caused the bruising on her face and body. As a result of all these injuries, the baby was in the [PICU] for five days, and but for the healing frenulum injuries, the doctor estimated that the acute injuries were inflicted in the preceding 72 hours.

*Id*. at 4-6 (citations omitted; paragraph breaks added).

Dr. Clarke also offered an assessment of the bruising on M.R.E.'s face.

As the orphans' court explained:

Dr. Clarke reviewed the photos from [a] professional photo shoot that occurred on [Monday,] September 9, 2019, between 9:00 and 10:00 a.m.,[2] and concluded that [M.R.E.] had already been abused by that point, as there was visible facial bruising on her right cheek, right jaw, and left forehead in those pictures, which correlated to the pictures taken in the hospital on September 11[,] and 12, 2019. Dr. Clark further reported that the "facial bruises resulted from impact trauma — either forceful impact or grabbing — that would not occur from normal, routine care of a neonate, from self-inflicted trauma or from a short household fall (the latter two being histories provided by her caregivers)[3]."

*Id*. at 7 (citing CYF Exhibit 9).

After conducting her consult, Dr. Clarke opined that M.R.E.'s injuries were indicative of abuse. She summarized her finding in her report as follows:

[M.R.E.] has extensive injuries that resulted from severe, inflicted violent trauma. These injuries are diagnostic of physical child abuse. Not only did she experience substantial pain at the time her injuries occurred, she continues to be in substantial pain and requires external respiratory support. [M.R.E.] is in serious condition, is admitted to the [PICU], and this qualifies as a Near Fatality from Injuries due to Child Abuse under Pennsylvania Law.[4] Given the history of prior bruising and an injured upper

_____

[2] Two days prior to M.R.E.'s admission to the hospital, Mother had arranged for a photographer to take photographs of the family.

[3] As explained more *infra*, an accidental fall from the bed was the first possible explanation Father eventually provided. Father and Mother also maintained M.R.E. cut her frenulum with her fingernails and bruised her face by sleeping with her fists against her jaw.

[4] ***See*** 23 Pa.C.S. § 6303 (defining "child abuse" and "near fatality" for purposes of the Child Protective Services Law, 23 Pa.C.S. §§ 6301 – 6388).

frenulum, [M.R.E.] has been abused on more than one occasion. She did not cause her bruising and frenulum injury. A fall from any household bed does not result in the extensive, massive injuries present in [M.R.E.] In addition, there is no medical condition that exists that would predispose these traumatic injuries in [M.R.E.]. She will die if she is returned to the environment in which she was abused. [M.R.E.] became symptomatic immediately after she was injured. Any reasonable adult would have recognized how severely ill [M.R.E.] was and sought medical attention.

CYF Exhibit 9.

A ChildLine report of child abuse pursuant to the Child Protective Services Law ("CPSL") alerted CYF and the police to the situation. Detective Michael Heinl from the Shaler Township Police Department, where Father and Mother resided, and Josie Pickens, a CYF intake caseworker, interviewed Father and Mother on the same night M.R.E. was admitted to Children's Hospital.

Initially, neither parent offered any explanation for how M.R.E. was injured. Both parents insisted M.R.E. seemed fine, other than her growing resistance to feeding on Tuesday and Wednesday that caused Mother to call the pediatrician and both parents to accompany her to the appointment. Both parents agreed that they were the only individuals who provided care for M.R.E. in the seventy-two hours prior to M.R.E.'s hospital admission. Both parents had opportunities to be alone with M.R.E., but generally, each participated in child caring duties such as bottle feedings and diaper changes.

Detective Heinl interviewed Father again on Thursday, September 12, 2019. This time, Father stated that while Mother was at an appointment on

Monday afternoon, he went to the bathroom and left M.R.E. laying on top of the bed in his bedroom. When he returned, three-year-old M.M.E. was standing over M.R.E., who was now lying face up on the hardwood floor. According to Father, M.R.E. seemed fine so he did not tell Mother about this incident until right before he told Detective Heinl.

After consulting with Dr. Clarke, Detective Heinl told Father and Mother that Dr. Clarke did not believe a three-year-old child's pulling an infant off a bed onto the floor was consistent with M.R.E.'s injuries. Detective Heinl informed Father and Mother he was leaving to consult with the District Attorney's office about filing criminal charges against them. Detective Heinl returned quickly upon a call from Ms. Pickens, who informed him Father wanted to make an additional disclosure after speaking privately with Mother.

Detective Heinl interviewed Father and Mother again, this time recording the interview. As Detective Heinl later recounted at the termination of parental rights hearing, Father stated that he "grabbed" M.R.E. by the arm, "lifted" her up, "looked" at her, and gave her "a squeeze and a quick shake to stop [her] from crying." N.T., 10/18/21, at 208; **see also** CYF Exhibit 2. Father contended this occurred on Monday evening, September 9, 2019, around 6:00 p.m. while Mother and M.M.E. were playing outside in the yard on M.M.E.'s swing set.

As a result of Father's disclosure, the Commonwealth charged Father with endangering the welfare of children and two counts of aggravated

assault. Through search warrants, the Commonwealth searched Father and Mother's respective cell phones, which revealed two significant findings. First, after M.M.E. had been admitted to the hospital, Father's brother-in-law ("Foster Father") texted Father to see how he was doing. Father responded, "[I]t is difficult to look my family in the face knowing they know what I have done[.]" N.T., 10/18/21, at 216.

Second, Detective Heinl obtained a history of web searches conducted by Mother from September 5, 2019, to September 11, 2019. During that timeframe, Mother conducted web searches using a variety of key words such as "bruising on baby, baby is not eating, bruising on jaw line, baby difficulty eating." *Id.* at 213; *see also* CYF Exhibit 3. Based on these web searches and her failure to obtain medical help for M.R.E., the Commonwealth charged Mother with endangering the welfare of a child.

At a point in time unclear from the certified record, the Childline child abuse report was indicated as to Father and Mother. *See* N.T., 11/18/21, at 33. In February 2021, Father's criminal case proceeded to trial. The Commonwealth *nolle prossed* the charges against Mother in exchange for her cooperation and testimony on behalf of the Commonwealth in Father's case.[5] *See* CYF Exhibit 3. Mother testified at trial, as did Detective Heinl. The

---

[5] Mother and Father separated after the incident. Mother later filed for divorce, which was finalized prior to the hearing to terminate their parental rights.

- 8 -

criminal trial adjourned for more testimony, but during the break, Father's mother, whom he intended to call as a witness, died. Upon the advice of his criminal counsel, Father pleaded *nolo contendere* to the first-degree felony charge of aggravated assault – attempt to cause serious bodily injury with extreme indifference, 18 Pa.C.S. § 2702(a)(1). The Commonwealth withdrew the other charges against him. On March 29, 2021, the criminal court sentenced Father to Allegheny County Jail for a minimum of 11 months and 29 days to a maximum of one year, 11 months, and 28 days. CYF Exhibit 3. Father was incarcerated from late April 2021 until late July 2021, when he was released on house arrest to serve the remainder of his sentence.

- Dependency of M.M.E. and M.R.E.

On September 11, 2019, the same night M.R.E. was admitted to Children's Hospital, CYF obtained an emergency custody authorization ("ECA") order permitting CYF to remove M.M.E. and M.R.E. from the care of Father and Mother. Although then-three-year-old M.M.E. did not present with any injuries, CYF also obtained an ECA for her because of the severity of M.R.E.'s injuries and M.M.E.'s vulnerability due to her young age.

The following day, CYF placed M.M.E. in kinship foster care with her paternal aunt ("Foster Mother") and Foster Father (collectively, "Foster

Parents"). CYF placed M.R.E. with Foster Parents upon her discharge from Children's Hospital.[6]

The juvenile court conducted a shelter hearing on September 16, 2019, ordering M.M.E. and M.R.E. to remain in foster care. CYF filed petitions to adjudicate M.M.E. and M.R.E. dependent pursuant to the Juvenile Act, 42 Pa.C.S. §§ 6301 – 6375. At the adjudication hearing on October 21, 2019, Father and Mother stipulated to the adjudication of dependency for both children, "acknowledging [M.R.E.] had suffered serious injuries while in their care but that the parents did not know how these injuries occurred." Orphans' Court Opinion, 3/3/22, at 9. CYF also offered testimony of Dr. Clarke, Dr. Rayburn, and Ms. Pickens. Mother testified on her own behalf, but Father did not upon the advice of counsel due to the pending criminal charges against him.

At the conclusion of the hearing, the juvenile court adjudicated M.M.E. and M.R.E. dependent. In its findings of fact, the juvenile court found M.R.E. was a victim of child abuse by her only caregivers, Father and Mother, and neither parent provided "any plausible explanations to account for M.R.E.'s injuries." CYF Exhibit 7. Additionally, the juvenile court did not find Mother's testimony to be credible that M.R.E. was not showing any signs of distress other than not eating, given Dr. Rayburn's testimony that M.R.E. had visible

---

[6] M.M.E. and M.R.E. remained in foster care with Foster Parents throughout their dependency. Foster Parents are willing to adopt both children.

bruising and was "screaming and having difficulty breathing," prompting

Dr. Rayburn to call an ambulance for M.R.E. within a minute of seeing her.

*Id*.

> This court saw the photos of the bruises and agrees that any reasonable adult would have known something was wrong with [M.R.E.]. This court also finds that based on the totality of the severe injuries inflicted upon [M.R.E.] by the time she was only 28 days old, the lack of plausible explanation for the injuries, Father's confession that [Dr. Clarke] did not think explained all of the causes of the injuries, and Mother's testimony that she did not notice anything wrong other than [M.R.E.] not eating as much, that [M.M.E.] is also without proper parental care and control and that there would be imminent risk remaining in this household.

*Id*.

In June 2020, the juvenile court made a finding of aggravated

circumstances against Father and Mother based on the child abuse to M.R.E.

It deferred its determination on whether CYF should cease making reasonable

efforts to reunify the family, and CYF continued to do so.

Throughout the two years M.M.E. and M.R.E. remained in foster care,

the juvenile court conducted seven permanency review hearings. At every

hearing, the juvenile court found Mother and Father to be compliant with the

objectives the court ordered them to achieve. Mother successfully completed

coached parenting sessions with Project Star; non-offenders' treatment at

Family Resources' nurturing parenting program; the Circle of Security

parenting program, and counseling through the Women's Center and Shelter.

Mother simultaneously participated in weekly therapy with two different

providers, Family Links and Collaborative Psychiatric Centers. Father

successfully completed coached parenting sessions with Project Star and non-offenders' treatment at Family Resources' nurturing parenting program. He also participated in mental health counseling at Choices Counseling. Both parents underwent multiple court-ordered forensic evaluations with psychologist Terry O'Hara, although prior to his plea Father declined to discuss certain topics with Dr. O'Hara. The parents also regularly visited M.M.E. and M.R.E. multiple times a week under the supervision of service providers or family members.[7]

Despite the parents' compliance with their goals, the juvenile court continually found each parent to have made little progress in rectifying the circumstances necessitating M.M.E. and M.R.E.'s placement into foster care, based upon their ongoing failure to acknowledge and take responsibility for the full extent of the severe abuse to M.R.E. *See* CYF Exhibit 7.

On April 27, 2021, CYF filed petitions to terminate involuntarily the parental rights of Father pursuant to 23 Pa.C.S. § 2511 (a)(2), (a)(5), (a)(8),

_____

[7] Each parent visited separately. Initially, orders in Father and Mother's pending criminal matters prohibited them from contacting M.M.E. and M.R.E. The criminal court lifted Mother's no-contact orders and Father's order as to M.M.E. early in the dependency case. Father's no-contact order regarding M.R.E. stayed in place until November 23, 2020, over a year after M.R.E. entered care. Father did not visit either child during his three months in prison from April to July 2021.

(a)(9), and (b), and Mother pursuant to 23 Pa.C.S. § 2511 (a)(2), (a)(5), (a)(8), and (b).

The orphans' court conducted hearings on CYF's petitions on October 18, 2021, November 18, 2021, and January 6, 2022. At the time of the hearings, M.M.E. was age five and M.R.E. was age two.[8] CYF presented the testimony of Dr. O'Hara, the forensic psychologist; Dr. Clarke, the medical child abuse expert; Valerie Shaffer, M.M.E.'s therapist; Detective Heinl, the investigating detective; William Pipkins, a supervisor at the foster care agency supervising visits and transporting the children to visits; and Erin Burzynski, CYF family services caseworker. CYF introduced a variety of exhibits, including Father's criminal record, the transcripts from Father's criminal trial and the dependency adjudication hearing, reports from Dr. O'Hara, and the dependency orders.

Mother, who was represented by court-appointed counsel, testified on her own behalf. She also introduced the testimony of Emily Anderson, her mental health therapist at FamilyLinks; June Ganley, her other mental health therapist at Collaborative Psychiatric Services; and the children's maternal grandmother. Father, who had his own court-appointed counsel, also testified on his own behalf and presented the testimony of Heidi Hysong, CYF adoption

---

[8] Prior to the contested hearings, the orphans' court appointed KidsVoice as legal counsel for M.M.E. and M.R.E. KidsVoice is the legal organization representing M.M.E. and M.R.E. as guardian *ad litem* in the dependency case. The orphans' court's May 11, 2021 pre-trial order indicated there was no conflict with KidsVoice's acceptance of the appointments.

caseworker; his sister-in-law; and Carly Petit, a Project Star caseworker who supervised visits early on in the case. Mother and Father also introduced records from various service providers.

Following the conclusion of the hearings, the orphans' court entered orders, dated January 6, 2022, and entered on January 22, 2022, involuntarily terminating the parental rights of Father and Mother under all grounds pleaded by CYF.

Father and Mother each timely filed notices of appeal from the termination orders concurrently with concise statements of matters complained of on appeal. The orphans' court issued one opinion pursuant to Pa.R.A.P. 1925(a). On appeal, Mother and Father ask this Court to decide whether the orphans' court erred or abused its discretion in the terminating their rights under 23 Pa.C.S. § 2511(a) and (b). **See** Father's brief at 3-5; Mother's brief at 8-9.

We review these issues mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." **In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. **Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the

evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, *supra* at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, *supra* at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K. supra*, at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M. supra*, at 359 (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *C.M.*, *supra* at 359; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa.Super. 2021). If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Thus, we will examine Mother's arguments pursuant to § 2511(a)(8), Father's arguments pursuant to § 2511(a)(9)(ii), and both parents' arguments pursuant to (b). Those statutory provisions are as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> .  .  .  .
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions

which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(9) The parent has been convicted of one of the following in which the victim was a child of the parent:

. . . .

(ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault)[.]

. . . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a), (b).

- Grounds Regarding Father

Father argues that this Court should reverse the determination of the orphans' court to terminate his parental rights pursuant to 23 Pa.C.S. § 2511(a)(9)(ii) because it relied upon his conviction for aggravated assault following his plea of *nolo contendere*. Father's brief at 28-30. Father

argues his plea of *nolo contendere* was not an admission of guilt and had no effect beyond his criminal case.[9] ***Id***. For the following reasons, we disagree.

Father's argument confuses the effect of his plea with the effect of his conviction. To constitute grounds for termination under § 2511(a)(9)(ii), CYF must prove that "[t]he parent has been convicted of one of the following in which the victim was a child of the parent . . . (ii) a felony under 18 Pa.C.S. § 2702 (relating to aggravated assault)[.]" 23 Pa.C.S. § 2511(a)(9)(ii). By its plain language, the Adoption Act only requires the petitioner to introduce proof of the parent's **conviction**, not proof of the facts underlying the parent's guilt. Generally, a *nolo contendere* plea cannot serve as an admission of guilt to certain facts in another proceeding. ***Commonwealth v. Moser***, 999 A.2d 602, 606 (Pa.Super. 2010). However, where, as here, a statute attaches legal

---

[9] Father cites ***In re Adoption of M.J.F.***, 2019 WL 160195 (Pa.Super. 2019) (non-precedential decision) for the proposition that "this [C]ourt held that a plea of nolo contender cannot be part of a consideration in determining whether an Agency presented clear and convincing evidence to justify termination of parental rights." Father's brief at 29. Father's reliance upon our purported holding is misplaced. We did not hold that evidence of a *nolo* plea is of no value. Instead, in a footnote addressing the effect of a father's *nolo* plea on the agency's burden to present certain facts about the alleged child abuse, we acknowledge that "a plea of *nolo contendere* is not an admission to the underlying conduct." ***In re Adoption of M.J.F.***, ***supra*** at *14 n.9. Hence, we concluded that the plea entered in that case could not be used as an admission of guilt **to establish the facts underlying the abuse**. Phrased differently, while a plea of *nolo contender* is not an admission of guilt, it is proof of conviction. As we explain in the body of this opinion, CYF did not invoke Father's plea to establish any facts underlying the assault of his daughter, but rather, to demonstrate the mere fact of Father's conviction of felony aggravated assault.

consequences to the mere fact of a conviction, proof of a conviction, even if it followed a *nolo contendere* plea, is enough to satisfy the statute. **See Eisenberg v. Commonwealth of Pa., Dept. of Public Welfare**, 516 A.2d 333, 336 (Pa. 1986) (upholding use of *nolo contendere* plea because the operative fact is the conviction and not the nature of the plea). Thus, the orphans' court did not err in considering Father's aggravated assault conviction as competent evidence establishing grounds to terminate parental rights pursuant to § 2511(a)(9)(ii), which requires only proof that Father was **convicted** of committing a felony aggravated assault against M.R.E. In this regard, CYS satisfied its burden by presenting evidence of the *nolo* plea, which has the same effect as a plea of guilty as to proof of conviction. **See Commonwealth v. Norton**, 201 A.3d 112, 114 n.1 (Pa. 2019) (although plea of *nolo contendere* is not admission of underlying facts, "for purposes of a criminal case, a plea of nolo *contendere* is equivalent to a plea of guilty."). Accordingly, we conclude the orphans' court did not abuse its discretion in finding CYF established the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(9)(ii).

- <u>Grounds Regarding Mother</u>

To satisfy § 2511(a)(8), the petitioner must show three components: (1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or placement of the child still exist; and (3) that termination of parental rights would best

serve the needs and welfare of the child. *In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018).

Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the children. *In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." *In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa.Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to

assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id*.

Mother contends that the orphans' court abused its discretion in terminating her parental rights under § 2511(a)(8), arguing that CYF did not prove the conditions continued to exist and that termination of her rights met the children's needs and welfare. Mother acknowledges "M.R.E. was abused," and admits she should have acted sooner in obtaining medical care for M.R.E.'s injuries. Mother's brief at 28. Much like her testimony at the termination hearing, Mother's brief is vague as to who abused M.R.E. or how M.R.E. was abused. Instead, she argues that she was not M.R.E.'s sole caregiver and "if she simply doesn't know how the injuries occurred" it is impossible for her to explain how M.R.E. was injured. *Id*. at 28. Mother emphasizes her complete compliance with all her goals, her acceptance of responsibility in not protecting M.R.E., and her improvement in her protective capacity after working with multiple service providers and counselors. *Id*. at 28-29.

In its Pa.R.A.P. 1925(a) opinion, the orphans' court credited Mother's compliance with services, efforts towards addressing her goals, and positive interactions with M.M.E. and M.R.E. at visits. *See* Orphans' Court Opinion,

3/2/22, at 23-24. Nevertheless, the court stressed that the one thing that remained unchanged between M.M.E. and M.R.E.'s entry into foster care and the termination hearings was that Mother never provided a credible explanation and full account of how M.R.E. was injured, accepted responsibility for abusing her, or provided acknowledgement or understanding as to how M.R.E. suffered such serious injuries by four weeks of age without Mother's recognition of the abuse or M.R.E.'s substantial pain. *Id*. at 24, 38. At its core, Mother did not fully address the underlying conditions that led to the severe abuse of M.R.E., the failure to protect M.R.E. from such abuse, and the failure to recognize M.R.E.'s grave distress and obtain prompt medical care. *See id*. Without such, the orphans' court determined that the conditions leading to the removal of M.M.E. and M.R.E. continued to exist and termination of Mother's rights served the needs and welfare of M.M.E. and M.R.E. to ensure their safety. *Id*.

While this is a close case, given our standard of review and the support in the certified record for the orphans' court's factual findings, we discern no abuse of discretion in the trial court's determination. M.M.E. and M.R.E. have been in foster care for over two years, having been placed there after M.R.E. suffered near-fatal injuries due to the physical abuse by one or both of her parents. According to Dr. Clarke, M.R.E. suffered multiple instances of abuse. First, she experienced a frenulum injury and bruising on the face prior to 9 a.m. on Monday, September 9, 2019. Her other injuries, namely, the skull,

rib, arm, and leg fractures, the neck sprain, the liver laceration, and the blood and fluid in her chest, brain, and spine, all occurred in one or multiple incidents between Sunday afternoon, September 8, 2019, and Wednesday afternoon, September 11, 2019. *See* N.T., 10/18/21, at 144. M.R.E. had only two caregivers during the timeframe in question: Father and Mother, both of whom provided hands-on care to M.R.E. and had ample access to her.

Dr. Clarke was quite clear that there was neither a "medical explanation" nor an "accidental history" provided by Father and Mother throughout the case "that would reasonably explain [M.R.E.'s] constellation of injuries." N.T., 10/18/21, at 143. Not even Father's admission that he shook M.R.E. one time, which led to his aggravated assault conviction, accounts for all M.R.E.'s injuries. *Id*. at 150; *see also id*. at 156 (Dr. Clarke's testimony that it is possible both Father and Mother were perpetrators). "When asked what could have possibly caused all of these injuries to a four[-]week[-]old infant, Dr. Clarke responded, 'Extraordinary violence multiple times.'" *Id*. at 154; *see also id*. at 133-60 (Dr. Clarke's opining that based on the nature of her injuries, M.R.E. did not experience one single act of violence, but may have experienced blunt force and impact to her midsection, an impact to her skull with "acceleration deceleration forces," yanking or jerking of extremities, and "violent shaking," squeezing, and/or stomping).

Even assuming *arguendo* that only Father participated in the physical abuse, which is something that remains a question,[10] the evidence indicates that Mother failed to protect M.R.E. by not recognizing signs of abuse over time or that she was in severe distress. Due to the sheer number of rib fractures M.R.E. had, Dr. Clarke believes M.R.E. would have exhibited

_____

[10] At the termination hearings, Father insisted he went "to jail for something [he] didn't do," and claimed Detective Heinl misinterpreted his alleged confession. N.T., 1/6/22, at 14, 54, 61 (claiming M.R.E.'s body shook when he lifted her, not that Father shook the infant). Instead, Father blames M.R.E.'s injuries upon Mother, insisting that Mother stepped on M.R.E. on Wednesday while he was at work. *Id*. at 34-37, 63. He based his belief on statements made by M.M.E., who has told Father and others that Mother stepped on M.R.E. *Id*. at 37. He also pointed to an incident where M.R.E. stomped on a baby doll on the floor while stating that "this is what mommy did to [M.R.E.]" *Id*. at 38-39.

There is some support in the record regarding Father's allegations. Father introduced a visit summary authored by visitation supervisor Carly Petit. *See* Father's Exhibit 1. In a visit with Mother two months after their removal, M.M.E. stated, "Mom[,] remember when you stepped on [M.R.E.]" *Id*. According to the visit notes, "Mother redirected her immediately stating[,']no[,] that didn't happen['] and [M.M.E.] said it again." *Id*. M.M.E.'s psychotherapist, Valerie Shaffer, testified at the hearing that M.M.E. has said several times in therapy that Mother hurt M.R.E. and stepped on M.R.E. *See* N.T., 10/18/21, at 168-75. Additionally, when Ms. Shaffer discussed Father's upcoming incarceration in therapy, M.M.E. responded, "[M]y daddy didn't do anything, though. Mommy hurt [M.R.E.]" *Id*. at 175. Ms. Shaffer has not seen any signs that an adult influenced M.M.E.'s beliefs about the incident. *Id*. Dr. O'Hara, on the other hand, could not rule out the possibility that statements by paternal relatives, some of whom have tension with Mother, may have influenced M.M.E. to make the statements. *Id*. at 70-74. *See also* CYF Exhibit 7 (March 4, 2020 permanency review order noting juvenile court's caution in ascribing significance to M.M.E.'s statements due to conflict between the sides of the family and M.M.E.'s placement with paternal relatives). The orphans' court, however, did not make a finding regarding these statements in the termination matter.

respiratory distress and a reasonable parent should have recognized her breathing difficulties. *See* N.T., 10/18/21, at 155. According to Dr. Clarke, M.R.E. "would have died" if she did not receive the chest tube to clear her lungs in the hospital. *Id*. at 142-43. Dr. Clarke acknowledges M.R.E.'s difficulty in breathing could have gotten incrementally worse as more blood and fluid collected in her lungs. *Id*. at 155. However, M.R.E.'s substantial pain would have been immediate. *Id*. at 154. Also, while some of her injuries may not have been obvious to a non-offending parent, the bruising on her face, which existed prior to Monday morning, clearly was. *Id*. at 158.

As Dr. Rayburn, the pediatrician, had explained at the adjudication hearing, she immediately was struck at the "incongruent" situation. CYF Exhibit 4. In her words, before her was a "newborn that was in clear respiratory distress with obvious bruising, but [Father and Mother] were anchored on the feeding." *Id*. Mother even brought out M.R.E.'s bottle to show Dr. Rayburn the amount M.R.E. ate that day compared to the amount M.R.E. typically ate, but the amount differed only by a few milliliters. *Id*.

CYF also proved that the risk Mother posed to the safety of M.M.E. and M.R.E. continued to exist after two years in foster care. The failure of both parents to admit what happened and to accept responsibility for their specific actions hindered CYF's ability to offer specific services targeting the underlying causes of their abuse and/or failure to protect M.R.E. As Dr. O'Hara, the forensic psychologist explained:

> without acknowledging specifics and particulars it is very difficult to address issues, such as potential anger management concerns, low frustration tolerance, a history of aggression, thoughts that may justify aggressive behaviors, or, on the other hand, issues of a protective capacity and the importance of being vigilant, recognizing particular warning signs, why one perhaps neglected to act in the face of significant warning signs of a partner. . . . [W]ithout this sort of concrete specific examination of various themes, . . . it is difficult to make substantive progress.

N.T., 10/18/21, at 22. ***See also*** N.T., 11/18/21, at 38 (CYF caseworker's testimony that without a full accounting of what happened to M.R.E., CYF was unable to set goals for the parents that fully addressed their incapacity to parent).

Although Mother denies being the perpetrator, unlike Father, Mother acknowledges some responsibility for her role in M.R.E.'s plight. Throughout her testimony at the termination hearing, Mother professed an understanding that she "failed to act" and should have realized M.R.E. was hurt and in pain. N.T., 11/18/21, at 127. She admitted she did not think M.R.E. was being abused and she "made excuses for . . . her injuries or [she] just didn't see it, being naïve." ***Id***. at 130. Mother testified that after undergoing multiple types of therapy and services, she has learned about signs of abuse, non-verbal communication, and looking at the big picture instead of "almost living in a bubble." ***Id***. at 131-163. ***See also id***. at 188, 197-98, 228, 239 (testimony from Mother's two therapists regarding her acceptance of responsibility in not obtaining medical care more quickly and growth in understanding her own cognitive state at the time).

Tellingly, when asked for specifics about what Mother was acknowledging when she testified that she knows M.R.E. was in pain "looking back on the scenario," Mother's response reflected no further insight into M.R.E.'s distress. *Id*. at 163-64. Mother continued to insist that M.R.E. was not crying and her primary concern in calling the pediatrician was M.R.E.'s lack of appetite. *Id*. Despite also claiming to notice two brief instances of rapid breathing, Mother's testimony appears to refer to that concern as an afterthought. *See id*.

In Dr. O'Hara's opinion, Mother has made

> some general progress in assuming some responsibility and [*sic*] not recognizing what should have been recognized, according to various medical professionals. But on the other hand, there is, I think, a lack of progress, from my perspective, why [Mother] didn't note these things, opposed to accepting her narrative that she didn't believe that [Father] would ever be capable of harming a child. So I think there's been some general progress but a lack of progress specifically targeting these serious injuries which providers state would be noticeable to any reasonable person.

N.T., 10/18/21, at 31. Notwithstanding Mother's exposure to "psychoeducation with regard to the protective capacity," and professed understanding that she should have done something, in Dr. O'Hara's opinion, there is still "a pretty significant gap" between Mother's general acknowledgement of responsibility and her inaction in face of the obvious severe injuries, as well as a "lack of understanding as to why there wasn't a response." *Id*. at 32. In other words, Mother still seemed to be in denial that

M.R.E. was in "very obvious distress" upon her presentment to the pediatrician and, later, the hospital. *Id*. at 29.

The orphans' court also found Mother's reaction to an incident during one of the supervised visits demonstrated her illogical disconnect with reality and lack of progress in increasing her protective capacity. *See* Orphans' Court Opinion, 3/2/22, at 29-31. During that visit, M.M.E. received a minor burn on her foot when Mother accidentally splashed hot water on her foot while she was cooking. N.T., 10/18/21, at 231. The foster care supervisor was present and observed Mother appropriately respond and provide care for the burn. *Id*. At M.M.E.'s next dependency hearing, the juvenile court found the incident was accidental. Yet instead of explaining the accident to Foster Father, Mother had informed him in a text that M.M.E. had a "brush burn." N.T., 11/18/21, at 135. As the orphans' court explained, Mother's decision to lie about the injury was inexplicable when Mother clearly knew hot water splashed on M.M.E.'s foot and the visit supervisor agreed the incident was an accident. Orphans' Court Opinion, 3/2/22, at 29-31. Nevertheless, "[M]other did not back down from her baffling position" at the termination hearing, "testifying, 'I texted [Foster Father] and told him it was a brush burn because when [M.M.E.] left me, it did not present as a burn. I didn't want to say, oh she got burned if there was no burn.'" *Id*. at 31 (citing N.T., 11/18/21, at 135).

Upon review of the certified record, it is clear this difficult case largely hinges upon the orphans' court's assessment of the parents' credibility and

competing evidence in the record. There are no definitive answers as to which parent was the perpetrator by commission and which parent was the perpetrator by omission. This is further complicated because both parents have positive interactions with M.M.E. and M.R.E., willingly participated in services, and, in Mother's case, made some progress in eliminating the conditions that led to M.M.E. and M.R.E.'s removal. Nevertheless, this case epitomizes why this Court defers to the factual findings of the orphans' court: it is the orphans' court that is on the "front lines assessing the credibility of witnesses and weighing competing and often challenging evidence." *S.K.L.R.*, *supra* at 1129. There is evidence in the record to support the orphans' court's findings that Mother (as well as Father) continues to pose a risk to the children's safety. *Cf. In re R.A.M.N.*, 230 A.3d 423, 429 (Pa.Super. 2020) (affirming the trial court's denial of agency's petition to terminate parental rights six years after parent's child died from child abuse because agency failed to prove continued existence of risk that parent would fail to protect her two living children). As such, we discern no abuse of discretion in the orphans' court's determination that the conditions continued to exist.

Likewise, we discern no abuse of discretion or error of law in the orphans' court's conclusion that termination of Mother's rights best served the welfare of M.M.E. and M.R.E. pursuant to § 2511(a)(8). M.R.E. has spent almost her entire life in foster care. M.M.E., who was age five at the time of the hearing, has been in foster care since age three. Reunification is not

imminent due to the continued risk to their safety. As explained in more detail in our analysis of § 2511(b), the court was within its discretion to prioritize M.M.E.'s and M.R.E.'s needs for safety and stability over their attachments to Mother and Mother's promise that she can keep M.M.E. and M.R.E. safe. **See R.J.S.**, **supra** at 513. Accordingly, we conclude the orphans' court did not abuse its discretion in finding CYF established grounds as to Mother.

Having determined that CYF met its burden under § 2511(a), the orphans' court then turned to § 2511(b), which required the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, **supra** at 628 (cleaned up). Our Supreme Court has made clear that § 2511(b) requires the trial court to consider the nature and status of bond between a parent and child. **In re E.M.**, 620 A.2d 481, 484-85 (Pa. 1993). To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." **Id**.

"While a parent's emotional bond with his or her child is a major aspect of the [§] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re M.M.**, 106 A.3d 114, 118 (Pa.Super. 2014). "In

addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *L.W.*, *supra* at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In the instant case, both parents argue the orphans' court erred by terminating their rights despite evidence of their individual bonds with M.M.E. and M.R.E. and detriment to M.M.E. and M.R.E. in severing those bonds. Father's brief at 32-33; Mother's brief at 31-35. Additionally, Mother argues that the orphans' court "ignored" Dr. O'Hara's opinion, which, according to

Mother, was that adoption does not meet the needs and welfare of M.M.E. and M.R.E. Mother's brief at 33.

The orphans' court's analysis indicates it considered a variety of factors in its needs and welfare analysis, all of which were supported by the record. Regarding M.M.E., the orphans' court emphasized the parent-child psychotherapy she is receiving. *See* Orphans' Court Opinion, 3/2/22, at 45-46. The goal of the therapy is to use her relationship with Foster Parents to help her process the trauma of the abuse to M.R.E. and being separated from her parents. *See* N.T., 10/18/21, at 165. At the inception of her therapy, M.M.E. was diagnosed with adjustment disorder with mixed anxiety and depressed mood. M.M.E.'s therapist, Ms. Shaffer, described M.M.E.'s connection to M.R.E., and how Ms. Shaffer has helped her distinguish between being her big sister versus feeling like M.M.E. has to save and protect M.R.E. from harm. *Id*. at 174. M.M.E. provides statements to Ms. Shaffer to include in a book about her life story. She often writes about M.R.E. and Foster Parents, her wishes that Mother did not hurt M.R.E., and missing Father when he was incarcerated. *Id*. at 167-68.

The orphans' court also found that M.R.E. and M.M.E. have a positive bond with Foster Parents. *See* Orphans' Court Opinion, 3/2/22, at 40-49. The court highlighted the testimony of Dr. O'Hara, CYF caseworker Ms. Burzynski, and Ms. Shaffer, all of whom described the reliance of M.M.E. and M.R.E. upon Foster Parents for comfort, care, and safety. The court pointed to Ms.

Burzynski's testimony opining that neither M.R.E. nor M.M.E. would suffer significant harm if the court terminated the rights of Father and Mother because Foster Parents are the main source of M.M.E. and M.R.E.'s care and support. *Id*. at 47 (citing N.T., 11/18/21, at 67).

The orphans' court also explicitly considered the bond and positive relationship M.M.E. and M.R.E. share with each parent, noting testimony by each parent; by Ms. Shaffer, M.R.E.'s therapist; and by Dr. O'Hara. *See* Orphans' Court Opinion, 3/2/22, at 39-49. However, despite the positive bond, the court determined that severing the bond with Father and Mother "would not cause extreme, irreparable emotional consequences for M.M.E. and/or M.R.E. that would not be mitigated by the safety, stability, love, and support they receive from [Foster Parents]." *Id*. at 49.

The court found that, given M.R.E. and M.M.E.'s age and time in care, their need for permanency was "critically important," but distinguished each child's experience with Father and Mother. *Id*. M.R.E. has spent all but her first month in kinship foster care, and her relationship with Father and Mother was forged during supervised visitation. The orphans' court determined the evidence "overwhelmingly" established that terminating Father and Mother's parental rights was in her best interests, given the brutal assault she endured in parents' care and her almost lifelong experience with Foster Parents meeting her needs. *Id*. at 48.

The court acknowledged that it was a "closer call" with respect to M.M.E. *Id*. M.M.E. spent the first three of her five years in Father and Mother's care, and the orphans' court acknowledged terminating their rights will have a greater impact upon her. *Id*. at 49. Nevertheless, the court determined that under the totality of the evidence, prioritizing her safety was most important. *Id*. In doing so, it relied upon the opinion of Dr. O'Hara, who noted that any detriment M.M.E. experienced as a result of the loss of Mother must be "weighed against the concerns of being with a caregiver who did not respond to substantial, visible injuries to an infant." *Id*. (citing CYF Exhibit 5).[11] The court concluded that the loss she will experience would be mitigated by her current circumstances of living in a safe home, regularly attending therapy, and remaining with M.R.E., with whom she has a deep relationship. *Id*.

_____

[11] Contrary to Mother's argument that Dr. O'Hara did not believe termination of Mother's rights served the children's needs and welfare, a review of Dr. O'Hara's testimony indicates that he did not form an opinion as to whether termination of either parent's rights would serve their needs and welfare. *See* N.T., 10/18/21, at 76, 78, 117. Based upon Father's *nolo contendere* plea, indications in the police report, and Father's admission to Dr. O'Hara that he was frustrated by M.R.E.'s crying, Dr. O'Hara operated from the assumption that Father alone inflicted the abuse and Mother neglected to notice obvious signs. *See, e.g., id*. at 53-66. Dr. O'Hara noted some emotional detriment to M.M.E. and M.R.E. in terminating Father's parental rights, but also advised against any unsupervised contact due to his failure to address the underlying causes of his abuse of M.R.E. and the continued risk to their safety. *See* CYF Exhibit 5. After reviewing various factors, he was unsure from a psychological perspective whether reunification with Mother or termination of her parental rights would best meet the children's needs and welfare. *Id*.; *see also* N.T., 10/18/21, at 117. Instead, he offered his opinion as to which competing factors were most significant in the court's task of making that determination. *Id*.

- 34 -

We discern no abuse of discretion in the orphans' court's analysis. The arguments by both parents ask this Court to re-weigh the factors in the record to prioritize the bond each child has with each parent instead of the other factors emphasized by the orphans' court. It is up to the orphans' court to consider the totality of the circumstances when performing a needs and welfare analysis. *See J.N.M.*, *supra* at 946. Nothing in our case law dictates that the bond between a child and parent must predominate over all other needs and welfare considerations. Instead, after ascertaining the nature and status of the bond and effect on the child of severing it, the orphans' court must weigh any pain from breaking the bond against other considerations as to what result serves the child's needs and welfare. *See T.S.M.*, *supra* at 267. It was within the discretion of the orphans' court to prioritize the safety and security needs of M.M.E. and M.R.E. over their bonds with their parents, and this Court will not interfere with the court's assessment when its factual findings are supported by the record. *See M.M.*, *supra*; *J.N.M.*, *supra*. Accordingly, no relief is due to either parent regarding the § 2511(b) determination of the orphans' court.

Based on the foregoing, we affirm the orders terminating the parental rights of Father and Mother.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/14/2022