J-S27034-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: H.W., A MINOR<br><br>APPEAL OF: M.W., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br>No. 1108 EDA 2022 |

Appeal from the Order Entered April 5, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002042-2018

| | |
|---|---|
| IN THE INTEREST OF: H.A.M.W., A MINOR<br><br>APPEAL OF: M.W., FATHER | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br><br><br><br><br><br>No. 1109 EDA 2022 |

Appeal from the Decree Entered April 5, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000083-2021

BEFORE: STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED OCTOBER 17, 2022**

M.W. ("Father") appeals from the decree involuntarily terminating his parental rights to his son, H.W. a/k/a H.A.M.W. ("Child"), and the order changing Child's permanency goal to adoption. We affirm the decree involuntarily terminating Father's parental rights and dismiss Father's appeal from the goal change order as moot.

This Court addressed a prior appeal by Father of a decree issued in 2021 terminating his parental rights and an order changing Child's permanency goal to adoption. In addressing that appeal, this Court previously set forth the factual and procedural history of this case, which we reproduce in relevant part as follows:

Child was born in March of 2017, and Father has been incarcerated for the duration of Child's life.

* * * *

On January 24, 2019, [the Department of Human Services ("DHS")] received a child protective services (CPS) report that [Child's m]other was not adequately supervising [him and his half-siblings]; that [Child] had a burn on his back that he sustained from hot grease two weeks prior to the [r]eport; that it was unknown how [Child] had sustained the burn; that [Child's] burn appeared severe; that [his] [m]other did not seek medical care for [Child]; and that [the m]other was not present in the home at the time of the incident.

The [r]eport alleged that [Child's m]other did not have a good relationship with her [c]hildren; that [she] yelled a lot at the [c]hildren and hit the[m] to control their behavior . . .. The [r]eport further alleged . . . that [the m]other displayed behaviors which possibly suggested that she suffered from mental health issues[,] and that [she] used phencyclidine (PCP). This [r]eport was determined to be indicated. A second report, issued the following day, stated[,] "[Child] was diagnosed with a 2nd degree burn with a surface area wound measuring ten centimeters by seven centimeters on his upper back region[.]"

Child was adjudicated dependent on June 6, 2019, when he was two years old. On February 16, 2021, DHS filed petitions to involuntarily terminate both Father's and [the] [m]other's parental rights, and on March 2[, 2021], petitions to change Child's permanency goal to adoption. The trial court conducted a hearing on April 28, 2021 . . .. Father was incarcerated at SCI-Somerset [at the time] and appeared by telephone. He was represented by counsel. . . .

[At the hearing, the trial court heard evidence that] [i]n 2015, [Father pleaded] guilty to the unlawful possession of controlled substance. In 2017 — the year of Child's birth — Father pleaded guilty to endangering the welfare of a child, aggravated assault, simple assault, and recklessly endangering another person. In December of 2017, he received a sentence of three to six years' imprisonment. Father's minimum release date was May of 2022. **No further information about his criminal offenses was presented**. As stated above, Father was incarcerated at the time of Child's birth, and has remained incarcerated throughout Child's life.

[T]he case manager with Turning Points for Children, [Jasmine Jackson ("Case Manager Jackson" or "Ms. Jackson"),] testified to the following. Father was not "any indicator for perpetrator of [the CPS] reports." He initially had one "single case plan objective[]:" "to maintain contact with [Ms. Jackson] for case planning. Case Manager Jackson did have communication with Father, by letter and telephone. When Father informed her he was taking parenting and GED classes at the prison, both were added to his single case plan objectives. These were his only case plan goals.

Furthermore, Case Manager Jackson observed telephone conversations between Child and Father, when [the m]other called Father during her visits with Child. Based on these telephone calls, Case Manager Jackson believed there was no parent-child bond between Father and Child. However, she also testified "everything [was] appropriate during those phone conversations." Father requested virtual visits with Child and provided the name of a contact person, but when Case Manager Jackson contacted that person, she did not receive a reply. Additionally, Father has not had telephone contact with Child through the foster parents.

Father testified to the following. Due to the COVID-19 pandemic, all prison programs, "except for school[,]" were "stopped." However, prior to the pandemic, he was participating in both GED and parenting classes, and he was to begin violence prevention class in the fall of 2021. [The m]other previously brought Child to visit him weekly at county jail, and Child was excited to see him, and would smile and laugh. He wished for Child to return to [his m]other, testifying, "[T]he children would have food. . . . And they had clothes that still had tags on them.

- 3 -

So I never really had nothing bad to say about her or show she treated the children." Father wished that he were at home, so that his relationship with Child "would be better than what it is now." However, he acknowledged, "[D]ue to the fact that I've been gone for so long, he probably wouldn't even remember me." Father likewise testified that he discussed having virtual visits with Case Manager Jackson, who "wrote an e-mail to the deputy that work[s] in visitation that can help with these kinds of visits[.]" Father "check[s] in" about the visits "here and there," but has not received any further information.

When asked why reunification between Father and Child has "been ruled out," Case Manager Jackson responded: "Due to his incarceration and his continued incarceration. He's not available to be a resource for [C]hild." She also testified she did not believe termination of Father's rights would cause irreparable harm to Child.

* * * *

At the end of that hearing, the trial court terminated Father's parental rights to Child, pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), (2), (5), (8) and (b)[, and changed Child's permanency goal to adoption.] Father timely [appealed.]

*Interest of H.W.*, 270 A.3d 1171 (Pa. Super. 2021) (unpublished memorandum at *1-*3) (internal citations, indentation, and some quotations omitted; emphasis added).

On appeal, this Court reversed the decree terminating Father's parental rights and the order changing Child's goal to adoption. We discerned that section 2511(a)(5) and (8) did not apply as, owing to Father's incarceration since Child's birth, Child was never removed from Father's care. *See id*. (unpublished memorandum at *5). We further determined that, at the termination hearing, Case Manager Jackson's sole reason stated in support of terminating Father's parental rights was the "mere fact of his incarceration."

*Id*. (unpublished memorandum at *6). We concluded that Father's incarceration, in itself, failed to rise to the level of clear and convincing evidence as required under section 2511(a)(1) and (2). *See id*. (citing *In re R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (noting that "incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to [s]ection 2511")).[1] We accordingly reversed the trial court's decree terminating Father's parental rights as well as the order changing Child's permanency goal to adoption.

Following this Court's reversal, the trial court held an additional evidentiary hearing on April 5, 2022.[2] At the hearing, Case Manager Jackson and Father both testified consistently with their prior testimony in April 2021. Father additionally conceded that he pleaded guilty to aggravated assault, endangering the welfare of a child, and recklessly endangering another

---

[1] We did not reach the trial court's analysis under section 2511(b), as there were insufficient grounds for termination of Father's parental rights under section 2511(a). *See id*. at *7. We further reversed the goal change order, given our reversal of the decree terminating Father's parental rights. *See id*.

[2] The trial court appointed counsel to serve in a dual role as counsel for Child as well as attorney-guardian *ad litem* ("GAL"). *See, e.g.*, Order, DP-2042-2018, 4/5/22 (directing that "G.A.L. to remain in dual roles"). The record demonstrates no divergence in Child's legal and best interests. *See In re P.G.F.*, 247 A.3d 955, 964 (Pa. 2021) (stating that "it is only when a child's best interests and legal interests do not diverge, or where the child's legal interests cannot be ascertained, that a court-appointed attorney may serve in the dual capacity of guardian *ad litem* and legal counsel . . ..")

person.[3]  *See* N.T., 4/5/22, at 44-45.  The victim of these offenses was another of Father's children, a son who was approximately fourteen or fifteen months' old at the time. *See id*. at 45.  In February 2016, while in Father's custody, Father's other son sustained injuries including a skull and rib fracture and a liver laceration.  *See* N.T., 4/5/22, Exhibit DHS 3, at 3.  Following his guilty plea, one of the several conditions of Father's sentence was that he have no unsupervised contact with minors.  *See* N.T., 4/5/22, at 46; *accord id*., Exhibit DHS 3, at 12.

Father testified that Child's mother would periodically bring him to visit Father in prison in 2017.  *See* N.T., 4/5/22, at 46-47.  In 2018, Father would have phone contact with Child through the mother.  *See id*. at 47.  In 2019, Father's contact with Child occurred via phone call, facilitated by Child's mother during her visits with Child.  *See id*. at 19, 48.  While Child's visits with his mother temporarily ceased in early 2020 due to the COVID pandemic, once the visits resumed later that year, Child's mother continued to make phone calls to Father during her visits with Child to facilitate their communication.  *See id*. at 21.  Ms. Jackson witnessed some of the conversations between Father and Child:

> [F]ather would call [the] mother's phone while they were there for visits.  Mom would put it on speakerphone and say, "[Child,] your father wants to talk to you."  [Father] would say, "Hi, [Child]."  [The mother] would say, "Say hello to your dad." [Child] would say, "Hi, dad."

---

[3] *See* 18 Pa.C.S.A. §§ 2702(a), 4304(a)(1), and 2705, respectively.

And then, for the most part, [Father] would talk to [Child]. [Child] would usually be playing, and then his mother would, at times, ask him to come back over to the phone and talk to his father.

\* \* \* \*

[Child] didn't [react to the end of the phone calls], for the most part. He would just continue whatever he was doing, playing with his brothers or playing with toys, watching a movie, *et cetera*.

N.T., 4/5/22, at 25. According to Ms. Jackson, the phone calls did not evince a parent-child bond because Child "was being instructed by his mother to engage in the conversation with [F]ather[.] [T]he type of conversations that . . . I saw . . . were the same type of conversations [Child] would have with anyone." ***Id***. at 26. Ms. Jackson never observed Child ask to call Father or ask about Father during a visit. ***See id***. She further testified that during her monthly visits, which occurred since 2018, Child never asked her about Father. ***See id***. at 26. Ms. Jackson testified that termination of Father's rights would not cause Child any irreparable harm. ***See id***. at 29.

Conversely, Ms. Jackson testified that she has had the opportunity to view Child in his foster home. He refers to his foster mother as "mom," and his foster father as "dad." N.T., 4/5/22, at 27. Child's foster parents see that his daily, educational, behavioral health, and medical needs are met. ***See id***. at 27-28. Child looks to his foster parents for help and assistance as well as love and affection. ***See id***. at 28. Ms. Jackson opined that termination of Father's rights would not cause Child irreparable harm, and that Child has

stated that he wants to stay with his current foster parents. ***See id***. at 29, 33.

At the conclusion of the evidentiary hearing, the trial court again terminated Father's parental rights, this time pursuant to section 2511(a)(1), (2), (9) and (b), and issued an order changing Child's permanency goal to adoption. ***See*** Decree, No. AP-83-2021, 4/5/22; Order, No. DP-2042-2018, 4/5/22; N.T., 4/5/22, at 54. Father timely appealed and both he and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

1. Did the trial judge rule in error that [DHS] [met] its burden of proof [for] Father[']s parental rights to [Child] . . . [to] be terminated.

2. Did the trial judge rule in error that the termination of Father's parental rights would best serve the needs and welfare of [Child].

3. Did the trial judge rule in error that [DHS] [met] its burden of proof [for Child's] goal [to] be changed to adoption.

4. Did the judge rule in error that it was in . . . [C]hild's best interest to change the goal to adoption[.]

Father's Brief at 4 (unnecessary capitalization omitted).

We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***See In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021). In applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are

supported by the record. ***Interest of S.K.L.R.***, 256 A.3d 1108, 1123 (Pa. 2021); ***see also In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021).

Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. ***See*** 23 Pa.C.S.A. § 2101-2938. Subsection 2511(a) provides grounds for the involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then consider whether termination would best serve the child under subsection (b). ***Id***. § 2511(b). This Court need only agree with one of the grounds set forth in subsection (a) to affirm, provided subsection (b) is also satisfied. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004).

In this case, the trial court terminated Father's parental rights pursuant to section 2511(a)(1), (2), (9) and (b). As we need only agree with the trial court's determination as to any one section of 2511(a), we limit our discussion to subsections (a)(9) and (b), which provide as follows:

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(9) The parent has been convicted of one of the following in which the victim was a child of the parent:

\* \* \* \*

(ii) a felony under 18 Pa.C.S.[A.] § 2702 (relating to aggravated assault);

\* \* \* \*

- 9 -

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(9), (b). The plain language of section 2511(a)(9)(ii) requires only the conviction of a felony under 18 Pa.C.S.[A.] § 2702. *See Interest of M.E.*, --- A.3d ----, 2022 PA Super 157 (Pa. Super. 2022) (stating that "[b]y its plain language, the Adoption Act only requires the petitioner to introduce proof of the parent's conviction, not proof of the facts underlying the parent's guilt").

Father argues, in relevant part, that the trial court erred in finding grounds for termination of his parental rights under subsection (a)(9) because the evidence establishing his aggravated assault conviction consisted of a certified criminal docket that should not have been admitted into evidence. *See* Father's Brief at 23. Father argues that his attorney did not receive DHS Exhibit 3 until the night before the hearing, and so he was put at a disadvantage because he did not have an adequate opportunity to "thoroughly investigate the document." *See id*. at 24. Father additionally argues that Exhibit 3 contains inadmissible hearsay. *See id*. Without the admission of

Exhibit 3, Father maintains, DHS failed to present clear and convincing evidence of grounds for termination under subsection (a)(9). *See id*.

The trial court explained its ruling, in relevant part, as follows: "We knew [at the time of the first hearing] that [F]ather was under a sentence of incarceration for violence against a minor child. . . . [I]n this case, we're talking about a man who has pled guilty to and been sentenced to a significant period of incarceration[] . . . with restrictions [on having unsupervised contact with minors] . . .." N.T., 4/5/22, at 49-52.

Following our review, we discern no abuse of discretion. Subsection (a)(9)(ii) provides that a conviction for aggravated assault, the victim of which was the parent's child, is grounds for termination. *See* 23 Pa.C.S.A. § 2511(a)(9)(ii); *Interest of M.E.*, 2022 PA Super 157 at *8. Here, Father admitted that he pleaded guilty in December 2017 to aggravated assault based on injuries to his other son, who was fourteen or fifteen months old at the time of the assault. *See* N.T., 4/5/22, at 44-45; *see also id*., Exhibit DHS 3. This evidence, including Exhibit DHS 3 and Father's own admission of the conviction, constitutes clear and convincing evidence of grounds for termination under (a)(9)(ii), and the trial court accordingly did not abuse its discretion in finding such.[4]

_____

[4] We note that while Father challenged the admission of DHS Exhibit 3 at the hearing, he failed to raise the issue in his Rule 1925(b) statement. He has thus waived his challenge to Exhibit 3. *See In re K.C.*, 903 A.2d 12, 16 (Pa.
*(Footnote Continued Next Page)*

- 11 -

In his second issue, Father argues the trial court erred in finding that termination of his parental rights was in Child's best interests under subsection (b). Where the grounds for termination under section 2511(a) are met, the trial court shall then give primary consideration to the developmental, physical, and emotional needs and welfare of the child under section 2511(b). *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The emotional needs and welfare of the child have been interpreted to include intangibles such as love, comfort, security, and stability. *Id*. The determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. *Id.* The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond. *Id*.

The evaluation of a child's bonds is not always an easy task. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (internal citation omitted). When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding

---

Super. 2006) (noting, "It is well established in this Commonwealth that any issues not raised in a 1925(b) Statement are waived").

evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover, a parent's emotional bond with her child, while a major component

of the section 2511(b) analysis, is nevertheless only one of many factors to

be considered by the court when determining what is in the best interest of

the child:

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent [as well as considering the] continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (internal

citations omitted).

Father argues the trial court abused its discretion in finding that

termination of his parental rights was in Child's best interest. Father claims

he was "trying to maintain his contact with [Child] as best he could." Father's

Brief at 25. He reiterates that he unsuccessfully attempted to set up virtual

visits through DHS and prison staff. *See id*. at 26. He also points out that

he had phone contact with Child during Child's visits with his mother. *See id*.

at 27.

Following our review, we conclude the trial court did not abuse its

discretion in determining that termination of Father's parental rights was in

Child's best interest under section 2511(b). Case Manager Jackson testified

that the phone calls Father and Child would engage did not demonstrate a

parent-child bond because Child was instructed by his mother to engage in

the conversations, and the conversations were indistinguishable from the sort Child would have with any person. N.T., 4/5/22, at 25. Ms. Jackson never observed Child asking to talk to Father or asking about Father during a visit. *See id*. at 26. Ms. Jackson, however, testified that Child refers to his foster mother as "mom," and his foster father as "dad," and that his foster parents see that his daily, educational, behavioral health, and medical needs are met. *See id*. at 27-28. Child looks to his foster parents for help and assistance as well as love and affection. *See id*. at 28. Ms. Jackson opined that termination of Father's rights would not cause Child irreparable harm, and that Child has stated that he wants to stay with his current foster parents. *See id*. at 29, 33. We discern no abuse of discretion by the trial court in concluding that termination is in Child's best interest, as the evidence establishes that Child looks to his foster parents for his safety and other intangible needs and that he has no appreciable bond with Father that would detrimentally affect him if severed. *See In re Adoption of C.D.R.*, 111 A.3d at 1219. Accordingly, Father is due no relief.

Given our disposition concerning termination of Father's parental rights, we conclude that his appeal from the goal change order is moot. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (concluding that a goal change challenge is moot in light of affirmance of a decree terminating parental rights); *accord In re Adoption of A.H.*, 247 A.3d 439, 446, *appeal denied*, 258 A.3d 1144 (Pa. 2021) (stating that "the effect of our decision to

affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption").

Decree affirmed. Appeal from order dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/17/2022